IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )        No. 3:12-CR-107
v.                               )
                                 )        (PHILLIPS / SHIRLEY)
MICHAEL R. WALLI,                )
MEGAN RICE, and                  )
GREG BOERTJE-OBED                )
                                 )
            Defendant.           )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on February 7, 2013, for a motion hearing on the Defendants' joint Motion to Dismiss New Sabotage Charge in Superseding Indictment [Doc. 72] and Motion of the Defendants to Dismiss for Overbreadth and Vagueness, or In the Alternative, for a Bill of Particulars [Doc. 75], both filed on January 18, 2013.[1]  Assistant United States Attorneys Jeffrey E. Theodore and Melissa M. Kirby appeared on behalf of the Government.  Attorney Christopher Scott Irwin represented Defendant Michael R. Walli.  Attorney Francis L. Lloyd, Jr., represented Defendant Megan Rice.  All three Defendants were also present. Defendant Greg Boertje-Obed represented himself with the aid of elbow counsel Assistant Federal

---

[1]The Court also heard argument on the Defendants' discovery motion [Doc. 73] and the Defendant's supplemental brief [Doc. 74] to the Government's Motion to Preclude Defendants from Introducing Evidence in Support of Certain Justification Defenses [Doc. 45].  The Court will rule on these motions, as well as the Defendants' request for a bill of particulars contained within their motion to dismiss [Doc. 75], separately.

Defender Bobby Hutson. The Court heard the arguments of the parties and took the motions under advisement.

## I. POSITIONS OF THE PARTIES

According to their own brief [Doc. 72, p. 6], on July 28, 2012, Defendants Walli, Rice, and Boertje-Obed "passed through four fences in a several hour walk into the Oak Ridge Y-12 Nuclear facility where, upon arriving at the Highly Enriched Uranium Materials nuclear facility, they symbolically disarmed the building and its surroundings." The Defendants state that once at the Highly Enriched Uranium Materials building,

> [t]hey splashed human blood on the building. They hammered on the wall. They stretched crime scene tape across the area. They spray painted words on the walls. . . . . They hung two banners . . . . When a guard arrived, they read aloud their statement and offered the guard bread and started singing[.] . . . . They were ultimately arrested and face this criminal prosecution.

[Doc. 49, p.7-9] The Defendants stand charged in a three-count Superseding Indictment [Doc. 55] with three felonies: Interfering with the national defense by destruction of the buildings and grounds of the Y-12 National Security Complex (Count One); destruction of a structure and other real and personal property within the Y-12 National Security Complex (Count Two); and injuring property of the United States with the resulting damages exceeding $1,000 (Count Three).

The Defendants advance four reasons for the dismissal of Count One:[2] (1) The statute

_____

[2]The Defendants asked the Court to dismiss Counts Two and Three in their joint Motion to Dismiss Charges [Doc. 44] filed in relation to the original Indictment [Doc. 2]. The Court issued a Report and Recommendation [Doc. 63] regarding that motion on January 2, 2013. The Defendants have objected [Doc. 71] to the report, and the Government has responded [Doc. 77]. The matter is now pending before the District Judge.

charged, 18 U.S.C. § 2155, is unconstitutionally vague and overbroad as applied to them, (2) Count

One is the result of a vindictive and selective prosecution, (3) Count One fails to state an offense as

a matter of law because the Y-12 National Security Complex is not a military base, and (4) the

upgrading and refurbishing of nuclear weapons is a crime under United States and international law.

The Government responds [Docs. 78 & 79] that (1) section 2155 does not prohibit legal expression

of First Amendment rights and that nuclear weapons are clearly encompassed within the term

"national defense," (2) Defendants cannot make a *prima facie* showing of either selective or

vindictive prosecution, (3) Y-12 meets the definition of "national defense premises, and (4) the

operations at the Y-12 National Security Complex do not violate United States law or constitute war

crimes and the Defendants lack standing to litigate a political question in this criminal case.


## III.  ANALYSIS

The Defendants call upon the Court to dismiss Count One of the Superseding

Indictment for constitutional, substantive, and policy reasons.  Count One charges the Defendants

as follows:

> The Grand Jury charges that, on or about July 28, 2012, within the
> Eastern District of Tennessee, the defendants, MICHAEL R. WALLI,
> MEGAN RICE, and GREG BOERTJE-OBED, aiding and abetting
> each other, with the intent to injure, interfere with, and obstruct the
> national defense of the United States, did willfully injure, destroy,
> and contaminate, and attempt to injure, destroy and contaminate
> national-defense premises, specifically, buildings and grounds of the
> Y-12 National Security Complex, in violation of Title 18, United
> States Code, Sections 2155(a), 2151 and 2.

The Defendants argue (1) that section 2155 is vague and overbroad as applied in this case, (2) that

the Government vindictively and selectively prosecuted them in bringing Count One, (3) that the

Y-12 National Security Complex is not a "national-defense premises" as a matter of law, and (4) that the maintenance of nuclear weapons at Y-12 violates United States and international law.

The Court begins with the basic constitutional requirement that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment by a grand jury[.]" U.S. Const. amend. V. "[A] trial may be held in a serious federal criminal case only if a grand jury has first intervened" and issued an indictment or presentment. Russell v. United States, 369 U.S. 749, 760-61 (1962). Legally insufficient indictments implicate not only the right to a grand jury's determination of probable cause to believe that the offense occurred but also the Fifth Amendment's guarantee of due process of law and protection against being twice placed in jeopardy for the same offense. Hamling v. United States, 418 U.S. 87, 177 (1974); Russell, 369 U.S. at 761. Also relevant is the Sixth Amendment's provision that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and the cause of the accusations[.]" U.S. Const. amend. VI; Russell, 369 U.S. at 761.

"The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). As a general rule, an indictment passes constitutional muster if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling, 418 U.S. at 117; United States v. Landham, 251 F.3d 1072, 1079 (6th Cir. 2001) (quoting Hamling). An indictment may allege the charges using the words of the statute itself as long as it gives all the elements of the offense "'fully, directly, and expressly[.]'" Hamling, 418 U.S. at 117 (quoting United States v. Carll, 105 U.S. 611, 612 (1882)); Landham, 251 F.3d at 1079. Moreover, the

statutory language "'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'" Hamling, 418 U.S. at 117-18 (quoting United States v. Hess, 124 U.S. 483, 487(1888)); Landham, 251 F.3d at 1079. The Court examines the sufficiency of Count One in the instant Superseding Indictment in the context of these fundamental rights and requirements.

## A. Vagueness and Overbreadth

The Defendants ask the Court to dismiss Count One, arguing that 18 U.S.C. § 2155(a) is unconstitutionally vague and overbroad as it is applied in this case. Count One charges the Defendants with a violation of the Sabotage Act, which states in pertinent part:

> Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than 20 years, or both[.]

18 U.S.C. § 2155(a). The Defendants contend that the term "national defense" in the statute is undefined and unconstitutionally vague. They also assert that if "an intent to injure, obstruct, or interfere with the national defense" can be applied to non-violent, symbolic acts, such as those in which they engaged, then § 2155(a) is unconstitutionally vague and overbroad.

### (1) Void for Vagueness

Generally, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

Kolender v. Lawson, 461 U.S. 352, 357 (1983). "[O]rdinarily '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others[.]'" United States v. Williams, 553 U.S. 285, 305 (2008) (quoting Hoffman Estates v. Flipside, 455 U.S. 489, 494-95 (1982)). The Supreme Court has distinguished between statutes that are void for vagueness under the Due Process Clause and the problematic hypotheticals that can be imagined under virtually any statute:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, [the Supreme Court has] struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"-wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

Id. at 306. To survive a vagueness challenge, a statute must give "relatively clear guidelines as to prohibited conduct." Posters 'N' Things, Ltd. v. U.S., 511 U.S. 513, 525 (1994). Such "objective criteria" will "minimize the possibility of arbitrary enforcement and assist in defining the sphere of prohibited conduct under the statute." Id. at 526.

As an initial matter, the Court questions whether the Defendants may bring a vagueness challenge to § 2155(a) because the Defendants clearly knew their conduct was prohibited. "Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." Maynard v. Cartwright, 486 U.S. 356, 361 (1988). In the instant case, the Defendants knew that entry onto the Y-12 premises, the cutting of fences, and the vandalism of government property were illegal and that is precisely why they chose to take those actions in order to raise awareness of their contention that the manufacture and storage of nuclear weapons is illegal. In response to

this position, the Defendants seem to be arguing that  knowledge that one's conduct places one at risk for criminal sanction or knowledge that something is "illegal" is not sufficient to place one on notice that he or she has violated a specific statute, particularly one carrying a potential twenty-year prison term.  In other words, the Defendants contend that they could not know that their conduct, which they characterize as non-violent and symbolic, would be construed as acts intended "to injure, interfere with, or obstruct the national defense."

"The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.  The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  United States v. Harriss, 347 U.S. 612, 617 (1954).  In § 2155(a), one commits sabotage (as opposed to the injury or destruction of government property or vandalism) if the person willfully injures a certain type of property–"national-defense material, national-defense premises, or national-defense utilities"–with a certain intent–the "intent to injure, interfere with, or obstruct the national defense[.]"  See United States v. Platte, 401 F.3d 1176, 1180 (10th Cir. 2005) (observing that §2155(a) "has two essential elements").  The question for the Court is whether these elements provide objective criteria that permit an individual to determine whether his or her conduct amounts to sabotage.  See Posters 'N' Things, 511 U.S. at 526 (observing that the presence of "objective criteria" minimizes the prospect that the statute will be applied arbitrarily and defines what it prohibits).

The Defendants argue that both the type of property[3] and the intent elements are

_____

[3]"National-defense material," "national-defense premises", and "national-defense utilities" all rely to some degree on the term "national defense."  The statute defines "national-defense premises" as

vague because they rely on the undefined term "national defense."  At the February 7 hearing,

counsel for Defendant Rice argued that § 2155(a) could be violated by conduct occurring either

inside or outside of a military installation but directed at the armed forces.  However, he contended

that if the statute reached conduct that occurred at a location other than a military installation and

was directed at government contractors, who were handling, without military supervision, items that

might become part of the national weaponry, it would be unconstitutionally vague.  The Government

argues that although the Sabotage Act does not define "national defense," that term is readily

understood by the average person and has been defined by the Supreme Court in relation to similar

language in the Espionage Act.

In <u>Gorin v. United States</u>, the Supreme Court addressed whether the term "national

---

> includ[ing] all buildings, grounds, mines, or other places wherein such
> *national-defense material* is being produced, manufactured, repaired, stored,
> mined, extracted, distributed, loaded, unloaded, or transported, together with all
> machinery and appliances therein contained; and all forts, arsenals, navy yards,
> camps, prisons, or other installations of the Armed Forces of the United States.

18 U.S.C. § 2151 (emphasis added).  "National-defense material" in turn,

> include[s] arms, armament, ammunition, livestock, forage, forest products and
> standing timber, stores of clothing, air, water, food, foodstuffs, fuel, supplies,
> munitions, and all other articles of whatever description and any part or ingredient
> thereof, intended for, adapted to, or suitable for the use of the United States in
> connection with the *national defense* or for use in or in connection with the
> producing, manufacturing, repairing, storing, mining, extracting, distributing,
> loading, unloading, or transporting of any of the materials or other articles
> hereinbefore mentioned or any part or ingredient thereof.

<u>Id.</u> (emphasis added).  "National-defense utilities" relates to the "means of transportation [for]
*national-defense material*" or troops and the means for "supply[ing] air, water, light, heat,
power, or facilities for communication to any *national-defense premises* or to the Armed
Forces[.]" <u>Id.</u> (emphasis added).

defense" in the Espionage Act of 1917[4] rendered the statute void for vagueness. 312 U.S. 19 (1941).

Defendant Gorin argued that interpreting the Espionage Act to reach "information connected with or relating to the national defense" aside from that concerning the places or items expressly listed in the statute would violate Due Process due to the indefiniteness of the statute. Id. at 22. The Supreme Court disagreed, observing first that limiting the statute to the places or items expressly listed would conflict with a plain reading of the statute. Id. at 26. Second, the Court found that the intent element of the statute protected it against a vagueness challenge:

> [In the Espionage Act,] the document or other thing protected is required also to be 'connected with' or 'relating to' the national defense. The sections are not simple prohibitions against obtaining or delivering to foreign powers information which a jury may consider relating to national defense. . . . .
>
> . . . . The obvious delimiting words in the statute are those requiring 'intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation.' This requires those prosecuted to have acted in bad faith. The sanctions apply only when scienter is established.

Id. at 27-28. Finally, the Supreme Court held that the term "national defense," although undefined, had "a well understood connotation[.]" Id. at 28. The Court agreed with the prosecution that "[n]ational defense . . . is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." Id.

The Court of Appeals for the Tenth Circuit determined that Gorin's treatment of the

---

[4]The Espionage Act of 1917 prohibited, in pertinent part, obtaining "information respecting the national defense with intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation"; copying "anything connected with the national defense"; and communicating " information relating to the national defense[.]" 50 U.S.C. § 31 (1941).

term "national defense," in a different, yet similar, statute, was "compelling authority" for construing the same term in § 2155(a). Platte, 401 F.3d at 1190. The court found that the defendants' conduct (vandalism and protest atop a nuclear missile silo that disrupted nearby military training) "clearly" came within the reach of § 2155(a). Id. "Even if the boundary of "national defense" is uncertain, nuclear weapons are far from the boundary." Id. Thus, the Tenth Circuit concluded that § 2155(a) was not unconstitutionally vague. Id.; see also United States v. Melville, 309 F. Supp. 774, 780 (S.D.N.Y. 1970) (holding that § 2155(a) is not unconstitutionally vague even though the term "national defense" is undefined).

The undersigned also finds the analysis in Gorin to be instructive. First, limiting § 2155 as the Defendants suggest by requiring the conduct either be on a military installation or directed toward the armed forces would contravene the plain language of the statute. "National-defense premises" includes "buildings" or other locations where "national-defense material is being produced," etc., "**and** all forts, arsenals, navy yards, camps, prisons, or other installations of the Armed Forces of the United States." 18 U.S.C. § 2151 (emphasis added). Thus, sabotage cannot be restricted to military installations. Moreover, "national-defense utilities" relates to the "means of transportation [for] national-defense material" **or** troops and the means for "supply[ing] air, water, light, heat, power, or facilities for communication to any national-defense premises **or** to the Armed Forces[.]" 18 U.S.C. § 2151 (emphasis added). Thus, § 2155(a) is not restricted to conduct directed at the armed forces.

Second, like the Espionage Act, the Sabotage Act contains an intent element that helps protect against arbitrary application. The inclusion of a scienter requirement decreases the likelihood that a person of common intelligence would not understand what conduct the statute

prohibits and reduces the chance that the statute will reach innocent conduct. Hill v. Colorado, 530

U.S. 703, 732 (2000). Section 2155(a) only prohibits the willful injury, destruction, infection, or

contamination of national-defense premises, material, or utilities when the perpetrator intends to

"injure, interfere with, or obstruct the national defense[.]" This inclusion of an intent element helps

ensure that the statute reaches those who "act[] in bad faith." Gorin, 312 U.S. at 28.[5]  Although not

addressing a vagueness challenge, the Eighth Circuit has recognized that the inclusion of an intent

element in § 2155(a) gives notice of the type of conduct prohibited: "The scienter requirement of

section 2155 protects those who do not recognize the military uses of property against which they

do violence." United States v. Kabat, 797 F.2d 580, 587 (8th Cir. 1986).

      Third, the Court finds that the term "national defense" within the intent element of

§ 2155(a) is not unconstitutionally vague. Terms not defined in a statute are presumed to have their

ordinary meaning. United States v. Santos, 553 U.S. 507, 512 (2008). The Supreme Court has

observed that "national defense" has "a well understood connotation" and that it broadly refers not

only to the military but also to "related activities of national preparedness." Gorin, 312 U.S. at 28.

The court in Kabat determined that the definition of "national defense" used in Gorin provides an

objective criteria against which to gauge a subjective intent:

> [The trial court] defined "national defense" as "a generic concept of
> broad connotations referring to the military and naval establishments

---

[5]At the February 7 hearing, counsel for Defendant Rice argued that the Government seeks to use the intent element in § 2155(a) as both a shield and a sword. He maintained that the Government argues that the intent element protects Count One from dismissal based upon the Defendant's vagueness challenge, yet seeks to preclude the Defendants from providing evidence of their intent. The Court recognizes the interrelated nature of the instant issues and those raised in the Government's Motion to Preclude Defendants from Introducing Evidence in Support of Certain Justification Defenses [Doc. 45], which will be addressed in a separate memorandum opinion.

and the related activities of national preparedness." The term "national defense" thus would refer to a tangible set of functions and policies which would remain constant as to all actors, and the government would only have to prove a subjective intent to interfere with what objectively would be known to be the nation's capacity to wage war and defend attacks.

797 F.2d at 586 (citation to trial record omitted). The Court finds that the ordinary understanding of "national defense" along with the fact that § 2155(a) contains a scienter requirement preserves the statute from a constitutional vagueness challenge.

The Defendants also argue that § 2155(a) is void for vagueness as applied to them because it reaches trivial or *de minimis* "injury" to the national defense. In this regard, they argue that their actions at Y-12 were non-violent and symbolic. The Government objects to the characterization of the damage caused by the Defendants as *de minimis*. At the February 7 hearing, AUSA Theodore argued that the Defendant's actions had an actual effect on the national defense because, as a result of their conduct, Y-12, which produces components for nuclear weapons, was shut down for two weeks.[6] [Doc. 84, p.37] Count Three of the Superseding Indictment alleges that the Defendants caused damage in excess of $1,000 to the property at Y-12.[7] Whether the Defendants' actions constituted injury to national-defense premises and whether they acted "with intent to injure, interfere with, or obstruct the national defense of the United States" are factual matters for the jury to determine. Nevertheless, the Court observes that the Eighth Circuit determined that a nuclear protestor causing $1089.74 in damage at a nuclear missile silo by spray

---

[6]The Court notes that this is the Government's allegation and makes no finding on whether or what portion of the shutdown is attributable to the Defendants' conduct at Y-12.

[7]Additionally, the Court notes that at an earlier hearing in this case, counsel for Defendant Walli stated that the Government had produced discovery claiming that the Defendants had caused $70,000 of damage to the fences at Y-12.

painting messages, chipping the concrete on the silo lid, pouring blood at the site, and hanging signs was properly convicted under the Sabotage Act.  Kabat, 797 F.2d at 583, 588, & 596.

The fact that a criminal statute reaches a range of conduct does not render it unconstitutionally vague.  The Tenth Circuit has opined that Congress intended § 2155(a) to have a broad scope and to encompass a range of conduct:

> [W]henever a criminal statute has such a broad scope, some prohibited activities may be much less reprehensible than others.  The maximum permissible sentence is designed for the most reprehensible offenses.  The least reprehensible may be excused as a matter of prosecutorial discretion or may receive lighter sentences from the court.  We would be ignoring this reality if we were to say that a statute was not intended to encompass conduct deserving significantly less than the maximum permissible sentence.

Platte, 401 F.3d at 1191 (remarking that "[p]erhaps courts should recognize an exception to § 2155(a) for *de minimis* conduct" but noting that defendants' conduct was not insignificant).  In other words, the trivial nature of a defendant's actions are only relevant to the vagueness analysis if the defendant could not have known that the statute reached those actions.  Here, the Court finds that § 2155(a) contains objective criteria–the type of property to which the statute applies and the requirement of a certain intent–that permit the average person to ascertain the type of conduct prohibited by the statute.

*(2) Overbreadth*

An otherwise constitutional statute "may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct."  Grayned v. City of Rockford, 408 U.S. 104, 114 (1972).  "The crucial question" in such a case "is whether the [statute] sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments."  Id. at 114-15.  As a

general matter, laws may not restrict speech simply because of its content or assemblies simply due to distaste for the common cause of those meeting, but "reasonable 'time, place, and manner' regulations" are permissible "to further significant governmental interests[.]" Id. at 115. "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating). Applications of [such a law or regulation] that violate the First Amendment can still be remedied through as-applied litigation[.]" Virginia v. Hicks, 539 U.S. 113, 124 (2003).

Although the Defendants contend that § 2155(a) is overbroad as applied to them, they do not argue that the statute restricts their right to free speech or assembly. Instead, they argue that to apply § 2155(a) to their symbolic, nonviolent conduct would be giving an overly broad interpretation to the statute. As the Tenth Circuit held in Platte,

> [t]he crucial inquiry, however, is not the seriousness of the activity but whether it is constitutionally protected. The punishment of minor offenses in itself does not render a statute unconstitutionally overbroad. Perhaps it is unwise to punish minor vandalism under § 2155(a), but vandalism is hardly protected activity. Accordingly, we can (and must) reject this argument without any need to proceed to the next step of the overbreadth inquiry-whether the protected activity is too likely to be chilled by the allegedly overbroad statute.

410 F.3d 1188-89; see also Kabat, 797 F.2d at 592 (observing that "the first amendment is not implicated in this decision" and that the defendants do not claim that the Sabotage Act punishes them for their speech). Accordingly, the Court finds that the Defendants' overbreadth argument is actually a type of vagueness argument, which the Court has already analyzed and rejected above.

## B. Vindictive and Selective Prosecution

The Defendants contend that they were vindictively and selectively prosecuted by

the addition of Count One in the Superseding Indictment. They assert that Count One, which carries

a twenty-year potential prison term, was added to punish them for choosing to exercise their Sixth

Amendment right to a jury trial. They also argue that they were selectively prosecuted with the

addition of the sabotage charge because nonviolent nuclear protestors are not generally charged with

sabotage. Again, they maintain that they were wrongfully singled out for exercising their

constitutional right to a jury.

*(1) Vindictive Prosecution*

"In our system, so long as the prosecutor has probable cause to believe that the

accused committed an offense defined by statute, the decision whether or not to prosecute, and what

charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher

v. Hayes, 434 U.S. 357, 364 (1978). The prosecutor's decision to prosecute an individual is entitled

to a "'presumption of regularity[,]'" and "'in the absence of clear evidence to the contrary, courts

presume that they have properly discharged their official duties.'" United States v. Armstrong, 517

U.S. 456, 464 (1996) (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15

(1926)). In light of the broad discretion granted prosecutors in charging a defendant and the many

factors involved in the decision to prosecute, courts are properly reluctant to scrutinize the decision.

United States v. Talbot, 825 F.2d 991, 999 (6th Cir. 1987). Nevertheless, the prosecutor's decision

to prosecute may not be based upon the defendant's choice to exercise his or her constitutional

rights. United States v. Davis, 15 F.3d 526, 529 (6th Cir. 1994).

"[I]n order to show vindictive prosecution there must be (1) exercise of a protected

right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's

conduct; [and] (4) the intent to punish the defendant for exercise of the protected right." United States v. Suarez, 263 F.3d 468, 479 (6th Cir. 2001). If the defendant establishes the first three factors, these factors may demonstrate a "realistic likelihood of vindictiveness," that helps show the fourth factor, subject to rebuttal by the government. Id. The mere appearance of vindictiveness from the circumstances is insufficient to warrant dismissal. United States v. Andrews, 633 F.2d 449, 455 (6th Cir. 1980) (en banc). Instead, a defendant must show a "realistic likelihood of vindictiveness." Id.

In the instant case, the Defendants were initially indicted on August 7, 2012, with the two felonies now charged in Counts Two (destruction of government property) and Three (depredation of government property) and with a misdemeanor trespass charge. These charges carry potential prison sentences of five years, ten years, and one year respectively. The Defendants contend that the prosecutors threatened to charge them with the more serious crime of sabotage if they refused to plead guilty.[8] The Defendants chose to exercise their Sixth Amendment right to a jury trial; and on December 4, 2012, the Government charged them with sabotage, which they contend is rarely used against civilians. The Defendants assert that they now face an additional twenty years in prison because they declined to plead guilty. They argue that the addition of the sabotage charge punishes them for exercising their constitutional rights in violation of due process

---

[8]The Government contends that the Defendants mischaracterize the plea negotiations in this case. It states that following the return of the original Indictment, it continued to investigate the facts of the case as well as the applicable law. After determining that additional charges were appropriate, the Government pursued informal plea negotiations in which the parties discussed the Defendants entering guilty pleas to the existing charges in order to resolve the case. The Government asserts that it "simply gave the defendants an opportunity to reduce their exposure before more charges were brought" [Doc. 78, p.3], an opportunity which the Defendants declined.

and constitutes a clear case of prosecutorial vindictiveness.

In Bordenkircher v. Hayes, the Supreme Court examined "whether the Due Process Clause of the Fourteenth Amendment is violated when a . . . prosecutor carries out a threat made during plea negotiations to reindict the accused on more serious charges if he does not plead guilty to the offense with which he was originally charged." 434 U.S. at 358. Defendant Hayes was originally charged with uttering a forged check for $88.30, which charge carried a potential penalty of two to ten years incarceration. Id. During plea negotiations, the prosecutor offered to recommend a five-year sentence, if the defendant entered a guilty plea, and threatened to bring a charge under the state habitual criminal act, which carried a mandatory life sentence, if he declined. Id. The defendant chose to proceed to trial, the prosecutor sought and obtained the new charge as stated, and the defendant was convicted of being a habitual criminal and sentenced to life in prison. Id. The Court held the bringing of the more serious charge did not violate Due Process but was, instead, part of the necessary "give-and-take" of the plea bargaining process:

> Plea bargaining flows from "the mutuality of advantage" to defendants and prosecutors, each with his own reasons for wanting to avoid trial. . . . . Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. . . . . Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial. . . . .

> While confronting a defendant with the risk of more severe punishment clearly may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable"– and permissible–"attribute of any

legitimate system which tolerates and encourages the negotiation of pleas." . . . . To hold that the prosecutor's desire to induce a guilty plea is an "unjustifiable standard," which, like race or religion, may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself. Moreover, a rigid constitutional rule that would prohibit a prosecutor from acting forthrightly in his dealings with the defense could only invite unhealthy subterfuge that would drive the practice of plea bargaining back into the shadows from which it has so recently emerged.

Id. at 364-65 (internal citations omitted) (quoting Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1977)).

Thus, the Supreme Court concluded that "the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." Id. at 365.

The undersigned agrees with the Defendants [Doc. 72, p.6] that the instant facts are indistinguishable from those in Bordenkircher. Accordingly, the Court finds that the reasoning in Bordenkircher also applies in the instant case and that the Government's bringing of the sabotage charge, as it advised that it would during plea negotiations, does not amount to prosecutorial vindictiveness. The Defendants advocate using this case as a vehicle to revisit the decision in Bordenkircher and to adopt the position espoused in Justice Blackmun's dissent. The Court observes that neither the Supreme Court nor the Court of Appeals for the Sixth Circuit have departed from the holding in Bordenkircher with regard to prosecutorial vindictiveness and plea negotiations in the intervening thirty-five years. See McKune v. Lile, 536 U.S. 24, 42 (2002) (relying on Bordenkircher to state that "plea bargaining does not violate the Fifth Amendment, even though criminal defendants may feel considerable pressure to admit guilt in order to obtain more lenient treatment"); United States v. Poole, 407 F.3d 767, 775 (6th Cir. 2005) (reasoning that "[i]n declining

18

to apply a presumption of vindictiveness, the <u>Bordenkircher</u> Court stated that the element of punishment . . . was not present in the 'give-and-take' of plea negotiation, so long as the accused is 'free to accept or reject the prosecution's offer'") (quoting <u>Bordenkircher</u>, 434 U.S. at 363). Although the Defendants urge the Court to "revisit the justice dimensions of" the majority's holding in <u>Bordenkircher</u> [Doc. 72, p.7], it is the job of this Court to divine and apply Supreme Court and Sixth Circuit precedent. In so doing, the Court finds that the Defendants were not subjected to prosecutorial vindictiveness.

*(2) Selective Prosecution*

The Defendants also argue that the Government selectively prosecuted them in bringing the sabotage charge in Count One. They contend that other nonviolent nuclear protestors have not been prosecuted under the Sabotage Act for engaging in similar symbolic actions. In this respect, they maintain that in the seventy-three years since the enactment of the Sabotage Act, it has been primarily applied to military personnel with civilians being prosecuted in only a handful of cases. They assert that they were deliberately singled out for prosecution under the Sabotage Act due to their decision to exercise their Sixth Amendment right to a jury trial. The Government responds that the Defendants have not made a *prima facie* case of selective prosecution because their conduct was more egregious than that of the typical nuclear protestor at Y-12.

"The Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." <u>United States v. Armstrong</u>, 517 U.S. 456, 464 (1996) (quoting <u>Wayte v. United States</u>, 470 U.S. 598, 607 (1985)). Accordingly, a decision to prosecute is entitled to a "presumption of regularity" unless there exists clear evidence to the contrary. <u>Id.</u> On the other

hand, prosecutorial decisions are subject to constitutional restraints.  Id.  Hence, "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification,'" in violation of the equal protection component of Due Process.  Id. (quoting Oyler v. Boles, 368 U.S. 448, 456 (1962)).

In order to establish a selective prosecution claim, the defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'"  Armstrong, 517 U.S. at 465 (quoting Wayte, 470 U.S. at 608) (citations omitted).  The Court of Appeals for the Sixth Circuit has established a two-part test for evaluating whether a defendant has been selectively prosecuted:

> "To prevail on a selective prosecution claim, a defendant must show that the federal prosecutorial policy had both a discriminatory effect and a discriminatory intent.  To establish discriminatory intent in a case alleging selective prosecution based on race, a claimant must show that the prosecutorial policy was motivated by racial animus; to establish discriminatory effect, the claimant must demonstrate that similarly situated individuals of a different race were not similarly prosecuted."

United States v. Jones, 399 F.3d 640, 645 (6th Cir. 2005) (quoting United States v. Jones, 159 F.3d 969, 976-77 (6th Cir. 1998) (citations omitted)).

In the instant case, the Court agrees with the Government that the Defendants have failed to make a *prima facie* case of discriminatory effect (that similarly situated nuclear protestors were not also prosecuted under the Sabotage Act).  As the Government points out, the Defendants' conduct in the instant case was more egregious than other nuclear protestors in this district.  In the two prior cases before this Court, the defendant nuclear protestors openly crossed the perimeter boundary "blue line" at Y-12 and were immediately apprehended.  See United States v. Gump, et al, No. 3:10-CF-94 (E.D. Tenn. May 6, 2011); United States v. Mellen, et al, No. 3:02-CR-47 (E.D.

Tenn. Sept. 4, 2002). In the instant case, based on the statements in the Defendants' brief, the Defendants

> passed through four fences in a two hour walk at the Oak Ridge Y-12 Nuclear Facility. . . . .
> . . . .
> The three reached the Highly Enriched Uranium Materials Nuclear Facility. They splashed human blood on the building. They hammered on the wall. They stretched crime scene tape across the area. They spray painted words on the walls. . . . . They hung two banners[.]

[Doc. 49, p.7] The Court finds that the instant Defendants are not similarly situated to prior nuclear protestors at Y-12 who came before this Court on trespass charges. Moreover, in United States v. Kabat, 797 F.2d 580 (8th Cir. 1986), and United States v. Platte, 401 F.3d 1176 (10th Cir. 2005), defendant nuclear protestors who crossed onto military installations and defaced or damaged government property relating to nuclear weapons were also charged with violations of the Sabotage Act. Accordingly, the Court finds that the Defendants have not made a *prima facie* showing of selective prosecution.

### C. Failure to State an Offense

The Defendants contend that the Sabotage Act is improperly charged because the Y-12 National Security Complex is not a military base but is run by private contractors, who have contracted with the United States Department of Energy. The Court takes the Defendants to be arguing that Count One fails to state a violation of 18 U.S.C. § 2155(a) as a matter of law because the acts alleged in Count One did not take place on a military or naval establishment. The Government responds that Y-12 meets the statutory definition of "national-defense premises."

21

As discussed above, § 2155 provides that

> Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than 20 years, or both . . . .

The statute defines "national-defense premises" as

> includ[ing] all buildings, grounds, mines, or other places wherein such national-defense material is being produced, manufactured, repaired, stored, mined, extracted, distributed, loaded, unloaded, or transported, together with all machinery and appliances therein contained; and all forts, arsenals, navy yards, camps, prisons, or other installations of the Armed Forces of the United States.

18 U.S.C. § 2151. "National-defense material" in turn,

> include[s] arms, armament, ammunition, livestock, forage, forest products and standing timber, stores of clothing, air, water, food, foodstuffs, fuel, supplies, munitions, and all other articles of whatever description and any part or ingredient thereof, intended for, adapted to, or suitable for the use of the United States in connection with the national defense or for use in or in connection with the producing, manufacturing, repairing, storing, mining, extracting, distributing, loading, unloading, or transporting of any of the materials or other articles hereinbefore mentioned or any part or ingredient thereof.

Id.

A plain reading of the definition of "national-defense premises" reveals that such are not limited to military installations. Section 2151 provides the following list of premises that are "national-defense premises": "all buildings[ or] grounds . . . wherein . . . national-defense material is being produced, manufactured, repaired, [or] stored . . .; *and* all . . . installations of the Armed Forces of the United States." (Emphasis added). By including the term "and" before military installations, the statutory definition reveals that it applies to other buildings and grounds in addition

22

to military installations. At the February 7 hearing, the Government stated that Y-12 National Security Complex is owned by the Department of Energy and overseen by the National Nuclear Security Agency. [Doc. 84, pp. 28-29] The Government stated that Y-12 makes components for nuclear weapons and nuclear fuel for the military. [Doc. 84, pp. 29] The Court finds that these proffered facts bring Y-12 within the definition of national-defense premises because it is a place that produces, repairs, and stores "national-defense material" (specifically nuclear arms and fuel) that is "intended for . . . or suitable for the use of the United States in connection with the national defense."

As discussed in part A above, the term "national defense" is not defined in the Sabotage Act. The Court has applied the definition used by the Supreme Court in <u>Gorin v. United States</u>, with respect to the Espionage Act of 1917,[9] to § 2155: "a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." <u>Gorin</u>, 312 U.S. 19, 28 (1941); <u>see also</u> <u>Platte</u>, 401 F.3d at 1190; <u>Kabat</u>, 797 F.2d at 586; <u>Melville</u>, 309 F. Supp. At 780. The Tenth Circuit has observed that even if the outer limits of the meaning of "national defense" are unclear, nuclear weapons clearly come within its reach. <u>Id.</u> The Court agrees and finds that the components of nuclear weapons and the refurbishing of nuclear weapons are clearly within its scope as well. Accordingly, the undersigned finds that § 2155(a) can be applied to the Defendant's alleged actions at Y-12.

## D. Violations of United States and International Law

_____

[9]The Tenth Circuit found that although <u>Gorin</u> dealt with a different statute, "the two statutes are so similar that <u>Gorin</u> is compelling autority" in interpreting the meaning of "national defense" in the Sabotage Act. <u>Platte</u>, 401 F.3d at 1190.

Finally, the Defendants argue that Count One should be dismissed because the production, processing, and storage of nuclear weapons violates both United States and international law. In this respect, the Defendants "reassert and apply their arguments from their original Motion to Dismiss [Docs. 44 and 49]" to Count One. The Court has already addressed this argument with regard to the entire Superseding Indictment[10] in its Report and Recommendation [Doc. 63], filed on January 2, 2013. In that report, the Court concluded that the Defendants' motion to dismiss the charges should be denied because (1) the justification-type defenses advanced by the Defendants are not a basis for dismissing the Superseding Indictment; (2) the Defendants lack standing to challenge United States policy on nuclear weapons, particularly in a criminal case; (3) the production, processing, and storage of nuclear weapons at Y-12 do not constitute a war crime as defined in 18 U.S.C. § 2441(c); and (4) the production, processing, and storage of nuclear weapons does not violate international law as expressed by the International Court of Justice. For all of the reasons expressed in its Report and Recommendation of January 2, 2013, the Court continues to recommend that the Defendants' motion to dismiss Count One be denied.

-------------------

[10]At the time the Defendants filed their initial Motion to Dismiss Charges [Doc. 44] and supporting legal memoranda [Doc. 49] and at the time the Court held the hearing on that motion, the Defendants were charged [Doc. 2] with the two felonies now alleged in Counts Two and Three and a misdemeanor of trespassing on Y-12 property. The Superseding Indictment [Doc. 55] added a violation of 18 U.S.C. § 2155(a) as Count One and removed the misdemeanor trespass offense. When the Court subsequently drafted its Report and Recommendation on the original motion to dismiss, it applied the Defendants' arguments to the charges in the Superseding Indictment. Although the Defendants have objected [Doc. 71] to this as a violation of Due Process because the parties had not briefed or argued the issues with regard to Count One, they now merely refer the Court to their arguments in their original motion without further explanation or elaboration. The Defendants acknowledge [Doc. 72, p. 11] that the Court has already analyzed these arguments with respect to Count One and state that they are "re-urg[ing] this here to protect the record."

### III.  CONCLUSION

The Court has carefully considered the parties' briefs and arguments along with the applicable case law and finds no basis to dismiss Count One of the Superseding Indictment. Accordingly, the undersigned respectfully **RECOMMENDS** that the Defendants' Motion to Dismiss New Sabotage Charge in Superseding Indictment [**Doc. 72**] and the Motion of the Defendants to Dismiss for Overbreadth and Vagueness [**Doc. 75**] be **DENIED**.[11]

Respectfully submitted,

　s/ C. Clifford Shirley, Jr.　
United States Magistrate Judge

---

[11]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).