## UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: May 08, 2015

Ms. Melissa M. Kirby
Mr. Luke A. McLaurin
Mr. Jeffrey E. Theodore
Office of the U.S. Attorney
800 Market Street, Suite 211
Knoxville, TN 37902

Ms. Judy Kwan
Orrick Herrington Sutcliffe
777 S. Figueroa Street, Suite 3200
Los Angeles, CA 90017

Mr. Thomas S. McConville
Orrick, Herrington & Sutcliffe
2050 Main Street, Suite 1100
Irvine, CA 92614

Ms. Anna Lise Lellelid-Douffet
84607 Camus Lane
Covington, LA 70435

Ms. Anne Elkins Murray
Orrick, Herrington & Sutcliffe
1152 Fifteenth Street, N.W.
Washington, DC 20005

Mr. Andrew S. Ong
Orrick, Herrington & Sutcliffe
1000 Marsh Road
Menlo Park, CA 94025

Mr. Marc R. Shapiro
Orrick, Herrington & Sutcliffe
51 W. 52nd Street
New York, NY 10019

Mr. William Patrick Quigley
7500 Dominican Street
New Orleans, LA 70118

Re:  Case Nos. 14-5220/5221/5222, *USA v. Michael Walli*
     Originating Case No. : 3:12-cr-00107-1

Dear Counsel,

   The court today announced its decision in the above-styled cases.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                                        Yours very truly,

                                        Deborah S. Hunt, Clerk

                                             Cathryn Lovely
                                             Deputy Clerk

cc:  Ms. Debra Poplin

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0086p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

      *v*.

MICHAEL R. WALLI; MEGAN RICE; GREG BOERTJE-OBED,

                *Defendants-Appellants*.

Nos. 14-5220/5221/5222

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:12-cr-00107—Amul R. Thapar, District Judge.

Argued: March 12, 2015

Decided and Filed: May 8, 2015

Before: BOGGS and KETHLEDGE, Circuit Judges; HELMICK, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Marc R. Shapiro, ORRICK, HERRINGTON & SUTCLIFFE, LLP, New York, New York, for Appellants. Jeffrey E. Theodore, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Marc R. Shapiro, ORRICK, HERRINGTON & SUTCLIFFE, LLP, New York, New York, Thomas S. McConville, ORRICK, HERRINGTON & SUTCLIFFE LLP, Irvine, California, Andrew S. Ong, ORRICK, HERRINGTON & SUTCLIFFE LLP, Menlo Park, California, Anne Elkins Murray, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C., Anna Lise Lellelid-Douffet, Covington, Louisiana, Judy Kwan, ORRICK, HERRINGTON & SUTCLIFFE LLP, Los Angeles, California, William Patrick Quigley, New Orleans, Louisiana, for Appellants. Jeffrey E. Theodore, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

KETHLEDGE, J., delivered the opinion of the court in which, HELMICK, D.J., joined. BOGGS, J. (pp. 12–14), delivered a separate dissenting opinion.

---

[*]The Honorable Jeffrey J. Helmick, United States District Judge for the Northern District of Ohio, sitting by designation.

## OPINION

KETHLEDGE, Circuit Judge. In the dark of night on July 28, 2012, in Oak Ridge, Tennessee, an 82 year-old nun and two Army veterans, ages 57 and 63, cut their way through four layers of fences and reached a building where the Department of Energy stores enriched uranium. There the trio spray-painted antiwar slogans, hung crime tape and banners with biblical phrases, splashed blood, and sang hymns. When a security guard finally arrived, the group offered him bread and read aloud a prepared message about "transform[ing] weapons into real life-giving alternatives to build true peace." Then the group surrendered to the guard's custody.

The group's actions caused about $8,000 of damage to government property. The government eventually charged them with trespassing in violation of 42 U.S.C. § 2278a(c) and injuring government property in violation of 18 U.S.C. § 1361. When the defendants refused to plead guilty to those charges, however, the government pulled the trespassing count (which was only a misdemeanor) and instead charged them with violating the peacetime provision of the Sabotage Act, 18 U.S.C. § 2155(a), which Congress enacted during World War II. That provision applies only if the defendant acted "with intent to injure, interfere with, or obstruct the national defense," and authorizes a sentence of up to 20 years. A jury convicted the defendants on the sabotage count and the injury-to-property count. On appeal, the defendants argue that, as a matter of law, they lacked the intent necessary to violate the Sabotage Act. We agree; and thus we reverse their sabotage convictions and remand for resentencing.

I.

The relevant facts are undisputed. The Y-12 National Security Complex is located in Oak Ridge, Tennessee. Although the Department of Energy administers the facility, private contractors perform virtually all of its operations. The facility's missions are several: to manufacture certain components for nuclear weapons; to test the reliability of certain components for nuclear weapons; and to store highly enriched uranium, much of which is

Nos. 14-5220/5221/5222        *United States v. Walli, et al.*                Page 3

eventually "down-blended" for civilian use. The facility is not used to store nuclear weapons and not otherwise used to manufacture them. No military operations are conducted there.

The facility stores highly enriched uranium at a building called the HEUMF (Highly Enriched Uranium Materials Facility). That was where the defendants hung banners, spray-painted slogans, and so on. They also struck the corner of the building with small hammers. The group's activities delayed the arrival of a shipment scheduled to arrive that afternoon. The government also shut down the facility for 15 days while it investigated why its security systems had failed to prevent three unarmed citizens from penetrating four layers of fences and multiple "lethal force" zones to reach the HEUMF building.

After the defendants' convictions, the district court sentenced Michael Walli and Greg Boertje-Obed (the Army veterans) to 62 months' imprisonment on each count and Megan Rice (the nun) to 35 months' imprisonment on each count, all to run concurrently. These appeals followed.

II.

A.

The defendants challenge the sufficiency of the evidence supporting their convictions under § 2155(a) of the Sabotage Act. That subsection provides:

> Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than 20 years, or both[.]

The defendants concede that the government proved one element of this offense: that they "injure[d] . . . national-defense premises[.]" But the defendants dispute the other element, namely, that they acted "with intent to . . . interfere with . . . the national defense"—which is what the government argues it proved at trial. We must affirm the defendants' convictions if, based upon the evidence admitted at trial, any rational jury could find beyond a reasonable doubt that they acted with intent to interfere with the national defense when they injured Y-12's premises. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The dispute is primarily legal rather than factual. As an initial matter, there is some confusion as to what "intent" means as used in this statute (and others). Per the "traditional view" of intent, a defendant intends a particular result under two circumstances: first, when he takes an action while consciously desiring that the action cause that result; and second, when he takes an action while knowing that the action is practically certain to cause that result. *See* 1 Wayne R. LaFave, Substantive Criminal Law § 5.2(a) (2d ed. 2014); *see also United States v. United States Gypsum Co.*, 438 U.S. 422, 445 (1978). As an example of the first scenario, "if *A* shoots *B* at such a distance that his chances of killing him are small, but with the desire of killing him, he intends to kill him[.]" 1 LaFave § 5.2(a). As an example of the second, if *F* places a time-bomb on a plane to kill *G,* he intends to kill everyone on the plane. *Id.*

Per the "modern view" of intent, in slight contrast, a defendant intends a particular result only in the first scenario, *i.e.*, if he consciously desires it as a result of the prohibited action. *Id.* § 5.2(b). In the second scenario—*i.e.,* when the defendant knows that his action is practically certain to have a particular result, but does not consciously desire it—he acts knowingly. *Id.*; *see also United States v. Ogden*, 685 F.3d 600, 604 (6th Cir. 2012) ("a defendant acts knowingly" when he is aware that a specified result "is practically certain to follow from his conduct") (internal quotation marks omitted).

Although these distinctions are helpful in analyzing this case, they make little difference to the outcome. For even under the modern view, a jury may *infer* that a defendant consciously desires a result if he "'knows that result is practically certain to follow from his conduct.'" *Gonzales v. Carhart*, 550 U.S. 124, 155 (2007) (quoting 1 LaFave § 5.2(a)). For purposes of the defendants' argument as to the sufficiency of the evidence, therefore, proof that they acted knowingly is proof enough that they acted intentionally. Hence the question before us is this: whether the jury could rationally find that, when the defendants cut their way into Y-12 and engaged in their protest activities there, they consciously desired to interfere with the national defense or knew that such interference was practically certain to result.

The answer to that question depends on what it means, for purposes of § 2155(a), to "interfere with . . . the national defense." We begin with the term "the national defense," which the Sabotage Act does not define. But the Supreme Court has defined that term for purposes of a

companion statute, the Espionage Act (which likewise does not define it). In *Gorin v. United States*, 312 U.S. 19 (1941), the Court held that "the national defense" is "a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." *Id*. at 28 (internal quotation marks omitted). We think it best to adopt the Court's definition absent some good reason to reject it; and like the Tenth Circuit, we see none. *See United States v. Platte*, 401 F.3d 1176, 1190 (10th Cir. 2005); *see also United States v. Kabat*, 797 F.2d 580, 586 (8th Cir. 1986) (adopting the same definition).

That said, the *Gorin* definition is so general (and thus vague) as to be of limited use for purposes of the Sabotage Act. It is hard to determine what amounts to "interference with" a "generic concept." What we need, within the bounds marked out in *Gorin*, is a more concrete conception of the national defense. But *Gorin* itself suggests a line of inquiry. To speak of "military establishments" and "related activities of national preparedness" raises the question: preparedness for what? The answer surely concerns military activity; but the Eighth Circuit has provided an answer even more specific. To begin, the national defense is a *function*—not a resource, object, or idea. *See Kabat*, 797 F.2d at 587 (interference with the national defense means interference with "the functioning of established military systems"). Specifically, "the national defense" refers to "*the nation's capacity to wage war and defend attacks*." *Id*. at 586 (emphasis added). Thus, to show some injury or interference with the national defense, it is not enough for the government to speak in terms of cut fences or delayed shipments or pens stolen from the Pentagon. What the government must establish, rather, is something functional: that the defendant's actions were either consciously meant or practically certain to impair the nation's capacity to wage war or defend against attack. *Id.*

Two cases from the military courts illustrate what it takes to meet this standard. In *United States v. Johnson*, 24 M.J. 101 (Ct. Mil. App. 1987), an airman threw bolts into the air intakes of two RF-4 Phantoms—highly specialized reconnaissance jets whose mission was to serve as "eyes for the battlefield commander"—moments before their pilots powered up the engines. *Id*. at 102. The result, as Johnson had every reason to expect from a briefing two weeks before, was to inflict extensive damage to the aircrafts' engines, knocking them out of service for "an extended period of time[.]" *Id*. at 102-03. The Court of Military Appeals held that

Johnson's conduct amounted to sabotage, because "injury to the national defense" for purposes of § 2155(a) "includes injury to a combat aircraft[.]" *Id*. at 107. That Johnson's squadron was stationed in South Carolina did not change the outcome, because the squadron was available for "operational" use with NATO. *Id*. at 102. Similarly, in *United States v. Ortiz*, 25 M.J. 570 (Air Force Ct. Mil. Rev. 1987), the defendant purposely disabled a safety system for an F-15 Eagle— an "air superiority fighter" and thus a "fast reaction device[,]" whose mission was to intercept potentially hostile aircraft (usually Soviet) as they approached U.S. airspace. *Id*. at 572. In *Ortiz* the F-15 was stationed in Alaska, "at a forward base along our defensive perimeter[.]" *Id*. The aircraft was unarmed at the time of Ortiz's conduct, and out of service for only about an hour. But "testimony indicated that unarmed F-15s can ordinarily be armed and combat ready in 15 minutes[,]" *id*.; and the court observed that "when critical weapon systems are rendered useless for even a short time national security has been affected[.]" *Id*. at 571. The court therefore affirmed Ortiz's conviction under § 2155(a).

The government has much less to work with here. Y-12 houses not a single weapon of any kind (other than the guards' firearms, presumably), much less any weapons whose brief incapacitation would affect the nation's ability to wage war or defend against attack. Nor does the facility manufacture any weapons. Instead it manufactures only components for them; and the government does not even venture to assert that the 15-day shutdown that resulted from the defendants' actions—much less the brief shutdown that was the foreseeable result of those actions—had any effect upon the size or effectiveness of the nation's nuclear arsenal. Nor, so far as the record reveals, were there any military units stationed at Y-12, much less any "fast-reaction" ones whose distraction for an afternoon would have impaired the national defense.

But the government argues that we should affirm the defendants' convictions under § 2155(a) for two reasons. The first is that the defendants knew that their intrusion into Y-12 "would elicit a vigorous response and cause a significant disruption to Y-12's operations." Gov't Br. 27. As an initial matter, the government implies that a mere "diversion of resources"—in the form of the guards' response to the intrusion, rather than continuing to do what they were doing before—amounts to interference with the national defense. To answer that suggestion on its own terms: responding to intrusions is what guards do, and thus not a

"diversion" at all.  None of the guards who responded to the defendants' intrusion were building bombs beforehand.  And so far as resources are concerned, guards are a sunk cost once hired (as these security guards were, by a private contractor) or assigned (as military police are).  To say that these guards were diverted from their duties is like saying a pilot is diverted from his duties when he flies a plane.  Nor, contrary to the government's suggestion, would there have been any effect on the national defense if the guards had shot the defendants during the course of their entry into Y-12.

The government's main argument in support of its disruption theory, however, is that the defendants knew that their actions were practically certain to shut down Y-12 for some period of time.  The government does not specify what it thinks that foreseeable period was, though it concedes that the period was shorter than the 15 days that in fact resulted as the government investigated its own (unforeseen) security failures in connection with the incident.  But suppose that the defendants knew that Y-12 was practically certain to shut down for as long as a week.  That shutdown itself would not be enough to show that the defendants knew their actions were likely to interfere with the national defense.  Instead, the government would need to show that the defendants knew that a weeklong shutdown of Y-12 would impair the nation's ability *to wage war or defend against attack*.  The government has not made that showing, or even tried.

The two cases upon which the government relies—the Tenth Circuit's decision in *Platte*, and the Eighth Circuit's in *Kabat*, both of which involved nuclear-weapons protestors—provide a study in contrast.  One contrast in particular:  the facilities in both cases were military-operated *nuclear missile facilities*, which, as the court pointedly observed in *Platte*, were required to launch their missiles within 15 minutes of a Presidential order to do so.  401 F.3d at 1178.  In *Platte*, the defendants were found atop the concrete blast doors of a Minuteman III intercontinental missile, holding black bags that responding military police thought might contain explosives.  *Id.* at 1179-81.  A Lieutenant Colonel testified that it would have been unwise to launch the missile in those circumstances.  *Id.* at 1180-81.  In *Kabat*, the defendants likewise reached the blast doors of a Minuteman missile, which they damaged with a rented jackhammer and compressor.  797 F.2d at 582.  They also damaged three radar devices.  *Id.* Even a brief disruption of those facilities' operations would have grievously impaired the

nation's ability to attack and defend. (Imagine, for example, if Soviet infiltrators had similarly disrupted the facilities' operations in the minutes before a Soviet first strike.) Hence these cases are like *Ortiz* writ large.

That the defendants in *Kabat* and *Platte* also hung banners and splashed blood, as the defendants did here, does not make this case like those for purposes of § 2155(a). What matters, for purposes of the Sabotage Act, is not so much the nature of the defendants' actions, as it is the foreseeable effect of those actions on the nation's ability to attack or defend. And in that determination the purpose of the incapacitated weapon or facility (or even resource, if a defendant restricted the government's access to it) is critical. A defendant who slashes the tires of an F-15 at a perimeter base in Alaska is guilty of sabotage; a defendant who does the same thing to an F-15 on display at the National Air Force Museum in Dayton is not.

That said, § 2155(a) does not require that the defendants' actions be practically certain to affect the national defense immediately or within a certain time. When proving intent based on practical certainty, however, the government must prove that the defendant knew that his actions were practically certain to have some effect on the national defense at some time. And so far as the record shows here, the defendants' actions in this case had zero effect, at the time of their actions or anytime afterwards, on the nation's ability to wage war or defend against attack. Those actions were wrongful, to be sure, and the defendants have convictions for destruction of government property as a result of them. But the government did not prove the defendants guilty of sabotage.

That is not to say, of course, that there is nothing a defendant could do at Y-12 that would violate § 2155(a). If a defendant blew up a building used to manufacture components for nuclear weapons, for example, and thereby prevented the timely replacement of weapons in the nation's arsenal, the government surely could demonstrate an adverse effect on the nation's ability to attack or defend—and, more to the point, that the defendant knew that his actions were practically certain to have that effect. But vague platitudes about a facility's "crucial role in the national defense" are not enough to convict a defendant of sabotage. And that, in the last analysis, is all the government offers here.

The government separately argues that the defendants' statements show that they consciously desired that their actions would interfere with the national defense. Specifically, Boertje-Obed stated in a jailhouse call that he sought to "oppos[e] nuclear weapons directly . . . through direct action." He also said he had hoped for a "transformation response" to the intrusion. Walli said that he wanted the United States to "disarm" its nuclear weapons, and that Y-12 was a "terrorist site." And Rice said she broke into Y-12 to "begin the work of disarmament." These statements, the government says, show that the defendants entered Y-12 "to further their goal of nuclear disarmament[,]" which if realized would interfere with the national defense.

The government mistakes motive for intent. "Motive is what prompts a person to act or fail to act." *United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011). In contrast, "[i]ntent refers only to the state of mind with which the act is done or omitted." *Id.* The distinction is one of immediacy—not in a temporal sense, but in the sense of the defendant's purposes. When T.E. Lawrence shot a wounded comrade before the enemy could take him prisoner (as he did more than once), his immediate purpose, and thus his intent, was to kill the man; but Lawrence's purpose beyond that, and thus his motive, was to spare the man likely torture before the enemy killed the man anyway. Here, the specific acts that the defendants must have taken "with intent to . . . interfere with . . . the national defense" are the acts that satisfy the other element of § 2155(a)—namely, the acts that "injure[d] . . . national-defense premises[,]" which is to say the acts that injured Y-12. Those acts were those of cutting through four layers of fences and then hanging banners, splashing blood, spray-painting slogans, and so on outside the HEUMF building.

The question, then, is whether the defendants consciously meant to interfere with the nation's ability to attack or defend when they engaged in those actions. No rational jury could find that the defendants had that intent when they cut the fences; they did not cut them to allow al Qaeda to slip in behind. Nor could a rational jury find that the defendants had that intent when they engaged in their protest activities outside the HEUMF. True, their ultimate goal in engaging in those activities was to advance the cause of disarmament, by persuading Y-12's employees to abandon their pursuits there. But "the ultimate end" that "compel[s] the defendant

to act . . . is more properly labeled a 'motive.'" *Kabat*, 797 F.2d at 587. And the defendants' immediate purpose in hanging the banners themselves, and in otherwise erecting their shrine outside the HEUMF, was simply to protest.

On this point *Kabat* again provides a contrast. There, the court held, the defendants had consciously desired to interfere with the national defense not because they engaged in some of the same activities the defendants engaged in here—hanging banners and singing hymns, *Id.* at 582—but because they also brought a jackhammer and compressor that they used to assault the missile silo's concrete lid. And they did so, Carl Kabat testified, in an "'attempt[] to actually disarm in every way possible, everything that we could do that would render this weapon unusable was done to the best of our humble and whatever ability.'" *Id.* at 585. By their own admission, then, the defendants in *Kabat* operated the jackhammer with the immediate purpose—however unlikely its realization might be—of reaching the missile and disarming it. The defendants here did nothing of the sort.

Finally, we reject the government's argument that the defendants intended to interfere with the national defense by seeking to create "bad publicity" for Y-12. First Amendment issues aside, it takes more than bad publicity to injure the national defense. The defendants' convictions under § 2155(a) must be reversed.

B.

We make shorter work of the defendants' remaining two arguments, which the defendants say are grounds to vacate their convictions for injuring government property in violation of 18 U.S.C. § 1361. First, the defendants argue that the prosecutor engaged in misconduct when he referenced 9/11 during his closing argument. We review that claim de novo. *United States v. Lawrence*, 735 F.3d 385, 432 (6th Cir. 2013). The prosecutor made that reference only in response to the defendants' argument to the jury that their actions were ultimately beneficial to Y-12 because they led to security improvements there. (The prosecutor responded by saying that 9/11 remained a tragedy even though it led to security improvements in air travel.) Suffice it to say that we agree with the district court that there was no misconduct.

Nos. 14-5220/5221/5222          *United States v. Walli, et al.*          Page 11

Second, Walli and Boertje-Obed argue that the district court abused its discretion in admitting evidence of their prior convictions (for injuring government property in violation of § 1361) for impeachment purposes under Federal Rule of Evidence 609. Having reviewed the testimony of both defendants, however, we conclude that the references to their prior convictions were minimal in their impeachment value and prejudicial effect alike. Moreover, in each instance the district court immediately gave a proper limiting instruction, which minimized any prejudice still further. *See, e.g., United States v. Bender*, 265 F.3d 464, 471 (6th Cir. 2001). The district court did not abuse its discretion.

C.

Finally, we make an additional determination regarding the defendants' sentences for their § 1361 convictions, which were identical in length to their sentences for their now-reversed § 2155(a) convictions. "When considering a multiple-count criminal judgment that produced interdependent sentences, we may vacate all sentences even if only one is reversed on appeal." *United States v. Faulkenberry*, 614 F.3d 573, 590-91 (6th Cir. 2010) (internal quotation marks omitted). "We possess this supervisory power to vacate and remand even when the parties do not challenge the defendant's sentences." *Id.* (internal quotation marks omitted). Here, the defendants' sentences were plainly interdependent, since their convictions were grouped under U.S.S.G. § 3D1.4 for purposes of calculating their guidelines ranges. *Cf. United States v. Lawson*, 535 F.3d 434, 446 (6th Cir. 2008). Indeed it appears that the guidelines ranges for their § 1361 convictions on remand will be substantially less than their time already served in federal custody. We will therefore vacate their sentences for the § 1361 convictions.

*    *    *

We reverse the defendants' convictions under 18 U.S.C. § 2155, affirm their convictions under 18 U.S.C § 1361, and remand their cases for entry of a judgment of acquittal in favor of each defendant on the § 2155(a) counts and for resentencing on the § 1361 counts.

---

## DISSENT

---

BOGGS, Circuit Judge, dissenting. The majority in this case correctly states that defendants may be convicted under the Sabotage Act on either of two theories:

(1) They specifically intended to interfere with or obstruct the national defense or;

(2) They undertook acts knowing that it was practically certain that such interference or obstruction would take place.

However, I part company with the majority, and therefore respectfully dissent, because I believe that a rational jury could convict defendants on the first theory. The issue of intent was specifically presented to the jury, and I believe that the jury rationally applied the correct legal instruction that it was given (Was it "the defendant's conscious desire or purpose to . . . cause a certain result . . . .").

Further, as the majority correctly states at page 4, a defendant can intend a result "if he consciously desires it as a result of the prohibited action." The majority seems to have no quarrel with the instruction quoted above.

I fear that the majority imports a "de minimis" exception into the statute and orders the defendants' acquittal under a "no (or very little) harm, no foul" theory that the statute does not support.

While courts in the relevant precedent cases have found (with some straining, in my opinion) some relatively immediate tactical effect on operational military activities, that is not what the statute requires. In the classic example of sabotage—destroying a pallet load of artillery shells at the factory—I would not read § 2155 to require some indication of where those shells were headed or how many shells were available in the supply chain.

To be sure, in the context of America's massive defense-industrial establishment, there is low risk of the tragedy described in Kipling's poem, "Epitaphs of the War: Batteries Out of Ammunition"

> If any mourn us in the workshop, say
> We died because the shift kept holiday.

Therefore, it may seem a bit overblown in our case, and in all of the cited cases, to say that the actions of the defendants would "interfere with or obstruct the national defense."

Nonetheless, the statute does not require some particular amount of interference or obstruction, and the tactical effects that the majority points to as distinguishing precedent cases from this one are illusory. Does anyone really believe that, if a missile launch had actually been required in the *Platte* case, that the protestors sitting on the silo lid would not simply have been blown away or that in the *Ortiz* case, there was an actual shortage of planes available? In our case, the jury heard evidence that the defendants here desired to interfere with the operations of the Highly-Enriched Uranium Material Facility exactly because it was involved in the manufacturing chain leading to the production of nuclear weapons. Nuclear weapons require highly-enriched uranium. The facility stores and makes available highly-enriched uranium and other nuclear-weapons components, even though its uranium stores were not being used for manufacturing weapons right now. Interference with the facility has the potential to obstruct the production of nuclear weapons.

In just the same way, obstructing a train carrying completed weapons to a submarine base may appear quite minimal and even quixotic – if the submarine goes to sea with twenty-three nuclear missiles instead of twenty-four, or if an extra half hour is required to move the train after removing the obstructers, it seems like pretty small beer. On the other hand, it is obviously obstructive.

The majority's rather casual statement at pages 6–7 that there is no effect on the national defense when there is an intrusion onto a (supposedly) highly secure military facility because "responding to intrusions is what guards do" and there would not "have been any effect on the national defense [even] if the guards had shot the defendants" seems somewhat overdone. If infiltrators invades an artillery-shell factory and, before reaching their target, are intercepted and

shot, I doubt most people would say that they had not interfered with the national defense, and even fewer would say that they did not "intend" to interfere even if their intent was wholly suicidal, let alone if they had clearly stated that they desired to obstruct the production of shells.

As the majority correctly states at page 5, we must affirm if a rational jury could find that "the defendants' actions were . . . consciously meant . . . to impair the nation's capacity to wage war."

> Testimony as to each defendant specified their intent:
>
> Walli: "I wanted all the criminal activities to stop," and
>
> "I hoped to institute the rule of law" in answering the question did you hope "to interfere with the operations at Y-12"; and Walli had stated that nuclear weapons were unlawful;
>
> Boertje-Obed: "we went to . . . oppose nuclear weapons directly . . . [t]hrough direct action";
>
> Rice: "we were able to . . . begin the work of disarmament";

Their intent to obstruct and interfere, however couched and however quixotic, was thus something that a rational juror could find existed.

Defendants clearly stated that their intent was to impede, in any way that they could, the production of nuclear weapons, which they regarded as illegal, undesirable and counter-productive, and the majority, at page 7, appears to be willing to concede an "intent" to shut down the facility for a week. The existence and degree of intent to obstruct was presented to the jury, and I would not override its judgment by declaring as a matter of law that no rational jury could find the intent to obstruct, simply because the obstruction here was by disrupting the general operation of the facility, rather than destroying a specific item.

Finally, I agree with the majority, at page 10, that creating bad publicity for the government is not chargeable as "obstruction" or "interference" under the Sabotage Act. However, because invading a facility involved in the production of nuclear weapons, with the intent of stopping "all the criminal activities," even if the possibility of achieving that objective is quite minimal, is a crime, and the jury so found. I would affirm the convictions and I therefore respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 14-5220/5221/5222

UNITED STATES OF AMERICA,
        Plaintiff - Appellee,

v.

MICHAEL R. WALLI; MEGAN RICE;
GREG BOERTJE-OBED,
        Defendants - Appellants.

> FILED
> May 08, 2015
> DEBORAH S. HUNT, Clerk

Before: BOGGS and KETHLEDGE, Circuit Judges; HELMICK, District Judge.

## JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the defendants' convictions under 18 U.S.C. § 1361 are AFFIRMED. IT IS FURTHER ORDERED that their convictions under 18 U.S.C. § 2155 are REVERSED, their sentences on all convictions are VACATED, and the cases are REMANDED to the district court for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk